# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1887

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff - Appellee, | * |
| | * |
| v. | * |
| | * |
| David Earl Harvey, also known as | * |
| Dave L. Clark, also known as Brandon | * |
| Wells, also known as Sherman E. | * |
| Mucker, also known as Ronnie | * |
| Lamarr Nelson, | * |
| | * |
| Defendant - Appellant. | * |

_____

No. 03-1885

_____

Appeal from the United States
District Court for the Western
District of Arkansas

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff - Appellee, | * |
| | * |
| v. | * |
| | * |
| Gerald Keith Miller, also known as | * |
| John C. Dowdell, also known as | * |
| Darnell Singleton, also known as | * |
| Dale Odean Bell, | * |
| | * |
| Defendant - Appellant. | * |

_____

Submitted: March 9, 2005
Filed: July 13, 2005
_____

Before BYE, BOWMAN, and MELLOY, Circuit Judges.
_____

MELLOY, Circuit Judge.

Defendants David Earl Harvey and Gerald Keith Miller appeal their sentences, alleging that the district court[1] improperly: (1) applied a sophisticated means enhancement, (2) held each defendant responsible for the criminal acts of the other, and (3) violated their rights under Blakely v. Washington, 125 S.Ct. 2531 (2004). We affirm.

I.

In February 2002 the Fort Smith, Arkansas Police Department began an investigation into passed counterfeit checks. The investigation, conducted by Detective David Young and another detective, traced the activity to Harvey and Miller. Young issued a "fraud alert" that included photographs of Harvey and Miller. On August 12, 2002, in response to the fraud alert, an Arkansas revenue officer contacted Young. She informed Young that Harvey and Miller were in her office attempting to obtain new Arkansas identification cards from previously issued cards. When police arrived at the office, Harvey fled on foot and was apprehended a few blocks away. Miller quickly left in a van he and Harvey had brought to the revenue

_____

[1]The Honorable Robert T. Dawson, United States District Judge for the Western District of Arkansas.

office, but was arrested nearby. Two other males were also found in the van at the time of Miller's arrest: Michael Chappel and Robert Brown. Chappel and Brown were interviewed by police and later released.

On September 25, 2002, Harvey and Miller were named in a four-count indictment by a grand jury in the United States District Court for the Western District of Arkansas. Counts One and Two charged them with uttering and possessing a counterfeit check in violation of 18 U.S.C. § 513(a). Counts Three and Four charged Harvey and Miller with producing a false identification document in violation of 18 U.S.C. § 1028(a)(1). On September 27, 2002, the two men were arraigned and entered pleas of not guilty. On October 24, 2002, Miller pled guilty to all counts. Harvey pled guilty to Counts One and Three on November 15, 2002.

Harvey and Miller were sentenced on March 20, 2003. At the sentencing hearing, the district court adopted the probation officer's determination that an eight-level increase was warranted pursuant to U.S.S.G. § 2B1.1(b)(1)(E) (2004)[2] because the total loss caused by the criminal enterprise was $73,576.39. The district court also adopted the probation officer's finding that the defendants' offense level should be increased two levels pursuant to U.S.S.G. § 2B1.1(b)(9)(C) (2004) for using a sophisticated scheme to commit their crimes. As to each defendant this resulted in a Guideline sentencing range of 57 to 71 months per count. The district court sentenced Harvey to 71 months imprisonment on each of the two counts, each count to run concurrently, three years supervised release, $10,289.52 restitution, and a $200 special assessment. The district court sentenced Miller to 71 months imprisonment

---

[2]The location of the relevant Sentencing Guideline provisions has moved from year to year, however, the wording and meaning that is germane to this opinion has not changed. All citations in this opinion refer to the location of the sophisticated means enhancement as it appeared in the 2004 edition of the United States Sentencing Guidelines.

on each of the four counts, each count to run concurrently, three years supervised release, $10,339.45 restitution, and a $400 special assessment.

Harvey and Miller now bring these timely appeals. They both appeal the district court's calculation of loss attributable to them individually. Harvey admits he passed bad checks in the amount of approximately $30,000. Miller admits he passed bad checks in the amount of $35,384.22. In each case, the admitted amount would result in a six-level rather than an eight-level Guideline increase. Both Harvey and Miller dispute the loss figure in excess of $70,000 because they contend that the losses caused by Harvey should not be attributable to Miller and those caused by Miller should not be attributable to Harvey. In addition, Harvey and Miller argue that their offenses did not require complex conduct and that the district court erred in finding they used sophisticated means to commit their crimes. We now address these issues.

## II.

We review the district court's factual findings at sentencing for clear error, while the application and construction of the Sentencing Guidelines are reviewed de novo. United States v. Smotherman, 285 F.3d 1115, 1116 (8th Cir. 2002).

A. Sophisticated Means Enhancement

The district court's finding under U.S.S.G. § 2B1.1(b)(9)(C) that Harvey and Miller employed sophisticated means did not constitute clear error. The sophisticated means enhancement applies when a defendant uses "especially complex or especially intricate offense conduct" to conceal his crimes. U.S.S.G. § 2B1.1, cmt. n.9(B). In this case, Harvey and Miller jointly planned, coordinated and carried out activities to hide their fraud. For example, Harvey and Miller moved from state to state to obtain false identification cards using various individuals' identities. Vehicle repair receipts

show that their travels included Georgia, Kentucky, Tennessee, Kansas, Oklahoma, and Arkansas. Further, they purchased numerous plane tickets to travel between cities. They went to substantial efforts to hide their activities within the city of Fort Smith. The two men went to different branches of the state revenue office in Fort Smith to obtain fraudulent identification cards in order to prevent clerks at the same state revenue office from recognizing them as someone to whom they had recently issued identification cards.

They also went to great lengths to make their transactions look legitimate. For their scheme to succeed and avoid detection, the two men obtained identification information from real people, used that information to obtain false identification cards or drivers licenses, and then used those identities to open checking accounts under the assumed identities. Harvey and Miller then put legitimate bank information on counterfeit checks. They would then use a computer to generate checks which looked authentic and then try to pass them. Thus, the scheme required them to: 1) constantly obtain new identification documents; 2) travel to new offices to obtain identification cards; and 3) know how to generate false checks with valid routing numbers but fictitious account numbers so as to avoid detection by the electronic check scanners used at many retail businesses to detect counterfeit checks.

These actions, even when taken individually, provide strong evidence of a scheme that was "extensively planned" and which was "executed with careful attention to detail." United States v. Jagim, 978 F.2d 1032, 1042 (8th Cir. 1992). Regardless, the actions when taken as a whole, demonstrate a highly complex plan. See, e.g., United States v. Wu, 81 F.3d 72, 73-75 (7th Cir. 1996) (examining the defendant's scheme as a whole to determine whether the sophisticated means enhancement was applicable). Accordingly, the district court did not clearly err when it applied the sophisticated means enhancement.

B. Loss Amount

The district court also did not commit clear error when it determined that Harvey and Miller acted in concert and therefore each could be held responsible for the losses caused by the other. Harvey and Miller argue that their relevant conduct should be limited to the loss attributable to the counterfeit checks that each one individually passed. To determine the amount of loss, the Sentencing Guidelines state that a defendant is responsible for "(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and (B) all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a). "'A jointly undertaken criminal activity' is a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy." U.S.S.G. 1B1.3, cmt. 2. The defendants' actions meet the definition of jointly undertaken criminal activity.

The evidence in this case shows that Harvey and Miller planned and carried out a scheme to achieve the unlawful end of possessing and passing counterfeit checks and possessing false identification. The defendants traveled together to the Fort Smith revenue office with the intent of obtaining identifications as part of a larger scheme of using those identifications to pass counterfeit checks. The men entered the revenue office during the same period of time to obtain the identifications. The two men were photographed passing counterfeit checks at approximately the same time at different cash register locations within the same Fort Smith Wal-Mart in February 2002. There is evidence that Harvey and Miller had been traveling together and possibly other people for at least two months prior to their arrest for the purpose of obtaining false identification. Further, the two men also shared resources to carry out their scheme when they both used the same apartment and van to carry out their criminal enterprise. Accordingly, there is substantial evidence that the two men were engaged in jointly undertaken criminal activity when they attempted to pass

-6-

counterfeit checks. As a result, each is responsible for all reasonably foreseeable acts and omissions in furtherance of that activity.

Some of the "[f]actors relevant to foreseeability include whether the defendant benefited from his co-conspirator's activities and whether he demonstrated a substantial level of commitment to the conspiracy." United States v. Bad Wound, 203 F.3d 1072, 1076 (8th Cir. 2000) (internal quotations and citations omitted).[3] In this case, Harvey and Miller both benefitted from the other's activities. Each defendant benefitted from the other by sharing resources. As stated earlier, the defendants shared a vehicle and an apartment address to further their criminal endeavor. Harvey and Miller also shared computer printed checks and a computer check-writing program. By working together, the defendants benefitted by being able to cover more territory, and thereby were able to pass more checks, obtain more identities, and better avoid detection. Thus, there is substantial evidence that both Harvey and Miller benefitted from the actions of the other.

Harvey and Miller both demonstrated a substantial level of commitment to the conspiracy. The extent of their travel to carry out their scheme demonstrates their commitment. The two men traveled together continuously with Chappel, and possibly others, working to obtain false identifications to pass counterfeit checks for

---

[3]It should be noted that U.S.S.G. § 1B1.3(a)(1)(B) does not merely refer to cases involving conspiracy convictions. Rather, it refers to the broader instance in which a defendant assists others in achieving an unlawful end. Therefore, the absence of a conspiracy charge or conspiracy conviction in this case does not affect our attribution analysis. See U.S.S.G. § 1B1.3(a)(1)(B) (stating that conduct is attributable to a defendant "whether or not charged as a conspiracy."); United States v. Hull, 160 F.3d 265, 269-70 (5th Cir. 1998) (concluding that the concepts of conspiracy and jointly undertaken criminal activity "may not be identical" and that "the scope of relevant conduct should not depend on whether a particular defendant has been convicted of conspiracy if so charged.").

at least two or three months prior to their August 12, 2002 arrest. Airline itineraries show that the two men took flights together around the country to pass counterfeit checks in different locations to avoid detection of their scheme.

The search of the van Harvey and Miller were traveling in at the time of their arrest also provides evidence of the depth of their commitment. The van contained birth certificates; identification cards; specialty paper for printing checks; and scraps of paper with names, birth dates, social security numbers, and credit card numbers with expiration dates. Some of the birth certificates were for individuals whose names were later found to be aliases of either Harvey or Miller.

The two men that were traveling with the defendants also offered evidence of the defendants' commitment to the scheme. When Detective Young interviewed Chappel he stated that he had traveled to Arkansas with both defendants to obtain Arkansas identification cards to pass bad checks from a non-existent bank account. Robert Brown testified that Miller and Harvey paid homeless people for their identification information.

Finally, the duration of Harvey and Miller's cooperation attests to their level of commitment. Detective Young testified that the pair passed counterfeit checks for at least six months, from February 2002 until their arrest. Thus, the breadth, duration, and scope of their joint operations demonstrate their substantial commitment. Given this level of commitment, the district court did not err in its loss attribution.

III.

Harvey and Miller assert that the district court's application of sentencing enhancements violated their rights under Blakely because the findings necessary for the enhancements were neither admitted by the defendants nor made by a jury based upon proof beyond a reasonable doubt.

In Blakely, the Supreme Court held that the imposition of a sentence enhancement above the State of Washington's Sentencing Reform Act range, based solely on the factual findings of the sentencing judge, violated the defendant's Sixth Amendment rights. Blakely, 124 S. Ct. at 2537. It constituted a Sixth Amendment violation because the findings were neither admitted by the defendant nor found by a jury beyond a reasonable doubt. Id. Following Blakely, and while this appeal was pending, the Court held in United States v. Booker, 125 S.Ct. 738 (2005), that "the Sixth Amendment as construed in Blakely does apply to the [Federal] Sentencing Guidelines." Booker, 125 S.Ct. at 746. Under Booker, "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by . . . a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." Id. at 756.

Although Harvey and Miller did object to the district court's finding that the sophisticated means enhancement applied to them and that each defendant could be held responsible for the acts of the other, they did not raise a Sixth Amendment objection. Accordingly, our review is limited to determining whether Harvey and Miller's sentences constitute plain error. See United States v. Pirani, 406 F.3d 543, 549 (8th Cir. 2005). To establish plain error, they must show that (1) there was an error; (2) the error was plain; and (3) the error affected substantial rights. Johnson v. United States, 520 U.S. 461, 466-67 (1997). "If all three conditions are met, an

-9-

appellate court may then exercise its discretion to notice a forfeited error, but only if . . . the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." Id. (internal quotations omitted). Further, the defendant has the burden of proving plain error. United States v. Olano, 507 U.S. 725, 734-35 (1993).

In Pirani, we held that a Booker/Blakely error "affects substantial rights" if there is a reasonable probability that but for the error the defendant would have received a more favorable sentence. Pirani, 406 F.3d at 552. In this case, Harvey and Miller, like the defendant in Pirani, have not met their burden to show that there is a "reasonable probability" the district court would have imposed more favorable sentences if the Guidelines had been applied in an advisory manner. Neither defendant offers any evidence that there is a reasonable likelihood that the district court would have imposed a different sentence under an advisory Guideline regime. Indeed, the district court sentenced the defendants to 71 months, the top of the Guideline range. Because the record, when taken as a whole, does not indicate that the district court would have imposed a more favorable sentence under the new sentencing regime, Harvey and Miller cannot establish the prejudice prong of the analysis. Accordingly, they fail to meet their burden to prove that the district court committed plain error in imposing the sentence enhancements.

For the foregoing reasons, we affirm the defendants' sentences.

_____