In the

# United States Court of Appeals
## For the Seventh Circuit
_____

No. 07-2763

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TERRANCE O. ROBINSON,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Central District of Illinois.
No. 06-20077-01—**Michael P. McCuskey**, *Chief Judge*.

_____

ARGUED JUNE 10, 2008—DECIDED AUGUST 7, 2008

_____

Before POSNER, COFFEY, and FLAUM, *Circuit Judges*.

COFFEY, *Circuit Judge*.  Terrance Robinson was charged
with seven counts of bank fraud for organizing a multi-
person scheme to create, pass, and cash counterfeit
checks, and he entered a guilty plea to each count. *See* 18
U.S.C. § 1344. He was sentenced to a total of 63 months'
imprisonment, within the guidelines range of 51 to 63
months. On appeal, he now challenges the sentence
imposed and contends that the district court erroneously
applied an upward adjustment for using "sophisticated
means," although he mislabels the argument as a chal-
lenge to the "reasonableness" of the sentence. *See*

U.S.S.G. § 2B1.1(b)(9)(C). We agree with the sentence imposed.

The following facts are drawn from the investigation, as well as from Robinson's plea agreement and presentence report. At his apartment in California, Robinson used a computer to manufacture counterfeit checks printed with actual bank routing numbers and the names and account numbers of legitimate business customers at those banks. One of the victim banks was Illinois-based First Midwest Bank. On the face of the checks Robinson included the purported payor, a telephone number that, if dialed, would direct the call to his cell phone. Robinson also mailed the checks that he had created to himself in Danville, Illinois.

Robinson proceeded to pass these bogus checks in the states of Illinois, Indiana, Missouri, and Minnesota with help from Cornelius Wilson and other accomplices that Robinson and Wilson recruited in Danville, Illinois. Robinson advised his accomplices of the risks involved in the scheme. He bought a typewriter and stored it at Wilson's house to use in adding the name of the accomplice who would act as payee. Robinson or Wilson would accompany the accomplice to a bank, currency exchange, or business where he or she cashed the check. Robinson later distributed the proceeds of the checks to the participants. On one occasion, an employee of a currency exchange in Danville dialed the telephone number printed on one of the fraudulent checks purportedly drawn on the bank account of Norbrek, LP, and spoke with Robinson, who, after identifying himself as "Steve Jones," advised the employee that the check had been legitimately issued to pay for an insurance settlement. Based upon that representation the currency exchange cashed the check. At

the time the scheme was uncovered, Robinson's accomplices had cashed 21 counterfeit checks totaling $27,956 and had created 36 others worth $63,213 that they had yet to cash.

Using the 2006 edition of the sentencing guidelines, the probation officer set Robinson's base offense level at seven, *see* U.S.S.G. § 2B1.1(a)(1), and added eight levels as the actual and intended loss exceeded $70,000, *see id.* § 2B1.1(b)(1)(E). The probation officer also recommended adding two levels for the use of sophisticated means, *see id.* § 2B1.1(b)(9)(C),[1] and four more levels for Robinson's leadership role, *see id.* § 3B1.1(a). After a three-level decrease for acceptance of responsibility, *see id.* § 3E1.1, the total offense level of 18, combined with Robinson's criminal history category of V, yielded an imprisonment range of 51 to 63 months. At sentencing, Robinson unsuccessfully disputed three of the probation officer's proposed findings. The only one of those objections relevant to this appeal is Robinson's opposition to the two-level increase under § 2B1.1(b)(9)(C) for using sophisticated means. Without that increase, his imprisonment range would have been 41 to 51 months' imprisonment.

In overruling Robinson's objection, the trial judge observed that during his nine years on the trial bench he had never seen a case where the counterfeiter printed a telephone number on a bogus check and thereafter proceeded to represent himself as the person who authorized the check. The court concluded that the upward

---

[1] Application Note 8(b) to § 2B1.1 defines "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."

adjustment for using a sophisticated means of this nature was appropriate because Robinson's method of concealing the fraud was unique and demonstrated that he had carefully executed the scheme after extensive planning. The court agreed with the probation officer's recommended imprisonment range and sentenced Robinson to concurrent terms of 63 months.

Robinson's first argument on appeal, although convoluted by references to "reasonableness" and to the separate increase for his leadership role, comes down to a disagreement with the district court's conclusion that he employed sophisticated means. Robinson granted that his scheme was "slightly unusual," but contends that it was not sophisticated because, he insists, his conduct was no more complex than the typical federal fraud case. In addition, Robinson posits that the court must have assumed that the scheme was complex due to the number of participants, and that the increase for sophisticated means actually duplicated the four-level increase for Robinson's leadership role.

We review an upward adjustment under § 2B1.1(b)(9)(C) for clear error. *See United States v. Allan*, 513 F.3d 712, 715 (7th Cir. Jan. 18, 2008); *United States v. Rettenberger*, 344 F.3d 702, 709 (7th Cir. 2003). Application Note 8(b) to § 2B1.1 defines "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." According to the application note, standard examples of a sophisticated fraudulent scheme includes transactions that utilize fictitious entities, corporate shells, or offshore financial accounts, U.S.S.G. § 2B1.1 cmt. n.8(b) (2006); *Allan*, 513 F.3d at 715, but a wide range of additional conduct also can satisfy the requirements of § 2B1.1(b)(9)(C), *see Allan*,

513 F.3d at 715. We recently applied § 2B1.1(b)(9)(C) in *Allan,* a case that neither party has cited. The defendant in that case created fake entities that made fictitious sales referrals to the customers of a computer company. *Allan,* 513 F.3d at 713-14. He also doctored the headers on facsimile transmissions to the computer company to make them appear as if they had been created by the customers and fabricated e-mail addresses and telephone numbers on the forms he sent to the computer company so that he could verify the referrals to anyone who inquired about their authenticity. *Id.* We upheld the district court's finding that the defendant's use of fictitious entities, doctored fax headers, and phony contact information satisfied the requirements for sophisticated means under § 2B1.1(b)(9)(C). *Id.* at 715-16.

In this case before us, the checks were printed with actual bank routing numbers, the names and bank account numbers of legitimate entities, and a telephone number that, if dialed, allowed him (Robinson) to confirm the checks' authenticity to the caller. On at least one occasion, Robinson actually misrepresented the legitimacy of a check in response to a caller who dialed the number seeking verification. Robinson's use of fictitious contact information to help conceal the invalidity of his scheme parallels the facts in *Allan*, and thus satisfies the requirements of § 2B1.1(b)(9)(C). *See also United States v. Harvey*, 413 F.3d 850, 853 (8th Cir. 2005) (noting that counterfeiter's creation of checks with valid routing numbers but fictitious account numbers alone constituted "strong evidence" of a sophisticated scheme under § 2B1.1(b)(9)(C)). Moreover, the district court did not err merely because more intricate schemes can be envisioned. *See Allan*, 513 F.3d at 716. Robinson's conduct satisfied

the sophisticated requirement as long as it displayed "a greater level of planning or concealment" than the typical case. *See United States v. Fife*, 471 F.3d 750, 754 (7th Cir. 2006); *United States v. Kontny*, 238 F.3d 815, 821 (7th Cir. 2001) (concluding that "sophisticated" as used in like adjustment for tax frauds under U.S.S.G. § 2T1.1 refers to efforts "that go beyond" but "not necessarily far beyond" the typical case). The district judge's observation that he had not encountered conduct like Robinson's during his nine-year tenure strongly suggests that check counterfeiters do not typically include phony contact information to promote their schemes.

Robinson's remaining argument also fails because the number of people involved in the scheme was not of import to the district court's decision to increase Robinson's guidelines range for using sophisticated means. Instead, Robinson's inclusion of a telephone number on the checks that, if dialed, allowed him personally to confirm the checks' authenticity to the caller, was "the detail" that compelled the district court to conclude that the scheme was sophisticated under § 2B1.1(b)(9)(C). In contrast, the district court concluded that Robinson deserved an upward adjustment under § 3B1.1(a) for leading, organizing, and directing the fraud scheme since he mailed the checks from California to Danville, recruited accomplices and warned them about the risks involved in the scheme, arranged to receive the calls from anyone scrutinizing the checks' authenticity, and, most importantly, controlled the money and distributed the proceeds. Although Robinson's inclusion of a telephone number on the checks affected the justification for both upward adjustments, a slight overlap between the facts that justify an upward adjustment for "sophisticated

means" and an upward adjustment for a leadership role does not prohibit the district court from applying both. *See United States v. Jackson*, 346 F.3d 22, 25-26 (2d Cir. 2003). Moreover, even if there is significant overlap, the same facts can serve as a foundation for both upward adjustments. *See id.*

We AFFIRM the judgment of the district court.