In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 23-2421

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAMES HARRIS,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:11-cr-00667-5 — **John J. Tharp, Jr.**, *Judge.*

---

ARGUED MAY 20, 2024 — DECIDED OCTOBER 2, 2024

---

Before FLAUM, BRENNAN, and KOLAR, *Circuit Judges.*

BRENNAN, *Circuit Judge.* James Harris has a lengthy criminal history including a federal criminal case, a state drug case, and a state gun case that resulted in an acquittal. He also has multiple violations of federal and state supervised release conditions, and a state supervised release revocation. Faced with this history, and after a two-day evidentiary hearing, the district court revoked Harris's federal supervised release.

Harris appeals, arguing that the district court did not have jurisdiction to rule on the alleged supervised release violations, as well as that the court made mistakes during the revocation hearing. We conclude that the district court had jurisdiction and committed no procedural errors, so we affirm its ruling.

**I**

### A. Harris's Criminal Background

The focus of this appeal is the revocation of Harris's federal supervised release ordered in his 2013 federal drug conviction. Harris's later 2016 state drug conviction, and acquittal in a 2023 state gun case, impacted his supervised release in this federal case.

In 2012, Harris was charged with and pleaded guilty in the Northern District of Illinois to conspiring to distribute heroin in violation of 21 U.S.C. § 841(a)(1), and with possessing a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1). He was sentenced to 66 months in prison followed by four years of supervised release. His conditions of supervision prohibited him from committing another state or federal crime and possessing controlled substances. Harris was released from prison and began supervised release on July 25, 2016.

Two months later, Harris was arrested and charged in the Circuit Court of Cook County, Illinois with distribution of a controlled substance. The federal district court was alerted to this violation of Harris's supervised release. The parties agreed to continue the revocation proceedings while Harris's state case remained pending. In 2018, Harris pleaded guilty to possession of heroin, and the state court sentenced him to

five-years in prison and two years of mandatory supervised release.

In light of that conviction, the district court revoked Harris's federal supervised release and sentenced him to one year in prison to run consecutive to his state sentence, followed by three years of supervised release. Harris began his new, three-year term of supervised release on March 17, 2020, which was expected to end on March 16, 2023.

Less than four months later, on July 21, 2020, Harris was again arrested and charged in Cook County, this time with state gun offenses, including possessing a firearm as a convicted felon in violation of 720 ILCS 5/24-1.1(a). A special report was filed with the district court, alleging that Harris had violated the terms of his federal supervised release by committing a state firearm offense. Five days later, the district court issued a bench warrant for Harris's arrest.

On August 13, 2020, Harris's supervised release in the state drug case was also revoked. The state imprisoned Harris for five months. He completed that term on January 14, 2021.

Following that incarceration, Harris remained on a hold stemming from his violation of federal supervised release. He asked the district court to place him on home detention while his state gun case was being resolved. The district court granted his request, imposed a curfew, and required him to wear an electronic-monitoring bracelet.

Over the next few months, Harris violated the conditions of his federal supervised release. By September 2022, the probation office reported Harris had violated the court-imposed curfew nine times and had become homeless.

In response, the district court initially ordered Harris detained. But at his request, the court released Harris, adding the condition that he "reside at or participate in the program of a community corrections facility (including a facility maintained or under contract to the Bureau of Prisons Salvation Army) for all or part of the term of supervised release, for a period up to 120 days." In late October 2022, the probation office again alerted the district court to violations of Harris's supervised release conditions. He had twice tested positive for using controlled substances and he also admitted that he had smoked marijuana and used a "vape p[e]n" he obtained from another Salvation Army resident.

Harris failed to complete the Salvation Army program and was discharged. Less than a week later, the district court ordered that Harris be detained at the Metropolitan Correctional Center Chicago (MCC). Another special report was filed, charging Harris with violating the recently added condition of release that he "participate in the program of a community corrections facility (including … the Bureau of Prisons Salvation Army)." Specifically, the report alleged that Harris (1) possessed "[n]arcotic/[d]rug [p]araphernalia," (2) failed "to meet with [his] case manager," (3) was found "in an [u]nauthorized area without staff authorization," and (4) possessed an "[u]nauthorized" item or one "not issued through regular channels." At Harris's request, the district court postponed his federal revocation proceedings until after his state gun case concluded.

Harris, still in detention, went to trial on the state gun case in June 2023. At trial, the State relied on testimony from an officer who arrested Harris. That officer said the Chicago police had received reports of a man with a firearm. When the

police arrived at the scene, they saw Harris set a brown purse on a table then run away. The police caught Harris, arrested him, and searched the bag, in which they found a firearm. Harris claimed that neither the purse nor the gun were his and that he did not know the gun was in the purse. Harris called LaDonna Crawford, who owned the purse and firearm, to testify on his behalf. She said she legally possessed the gun pursuant to a state license. She also explained why Harris had her purse. Another friend had accidentally taken her purse when unloading groceries from her car. That friend gave Harris the purse to return to Crawford. Closing arguments focused on whether Harris knew that the gun was inside Crawford's purse. The defense argued that Harris ran from the police because he had an active arrest warrant at that time. The jury acquitted Harris of all charges in the state gun case.

Harris then filed an emergency motion with the district court seeking immediate release from detention. But the court denied his motion, concluding that grounds for detention still existed—the alleged federal supervised release violations. In response, Harris filed a "Motion For the Court to Calculate When Defendant's Supervised Release Should Terminate." In it, Harris stated that he was unsure the "exact date" in 2020 when his three-year term of supervision began but posited that his term "either has expired or [was] about to expire." He asked the court to determine whether his supervised release term had lapsed and, if so, to terminate any further proceedings.

The government responded by setting forth the district court's continuing jurisdiction. To the government, the term of supervised release, which began on March 17, 2020, would have expired on March 16, 2023. But the term was tolled for

approximately five months—from August 13, 2020, through January 14, 2021—when the supervised release in Harris's state drug case was revoked. The government emphasized that Harris had requested and agreed to delay revocation proceedings on his federal supervised release until after the conclusion of his state gun case.

## B. Revocation Hearing

The district court held a two-day evidentiary hearing in July 2023 to consider the revocation of Harris's federal supervised release. The court relayed his history of detainment, including the five-months when Harris was imprisoned for violating his state supervised release as a result of the state gun charge. But the parties did not discuss this history in connection with the court's jurisdiction. Rather, they considered whether the federal Bureau of Prisons would credit Harris for time served in pretrial detention on the state gun charge. The court believed that the time Harris served related to the state gun case would apply to that case, not to the revocation sentence in his federal case.

The government sought to prove that Harris violated three supervised release conditions: (1) misconduct at the Salvation Army in fall 2022; (2) possession of a firearm in July 2020 (as charged in the state gun case); and (3) though not formally charged as a violation, fighting at the MCC. On the first, Harris's counsel explained that Harris was "in a position to admit to" several violations, those being "coming up positive for marijuana and … some MDMA" and being "in a restricted or an unauthorized area … at the Salvation Army." But on the second and third, concerning the firearm and MCC fight, Harris's counsel indicated that Harris would contest those allegations. Specifically, as to the firearm-related allegation, counsel

stated that Harris has "said all along that he's not guilty of that. That's his position."

The government provided evidence in support of the three violations. First, as to the alleged misconduct, it explained that "[e]ven though Mr. Harris is admitting to the violation," it wanted to present a report issued by the Salvation Army that chronicled numerous allegations of misconduct at the facility. After the government summarized months of violations in the report, Harris's counsel interjected, "Harris just wants me to basically relate [why] he was in the Salvation Army. … But we do not disagree with the report or the things that were alleged regarding the violations at the Salvation Army." Harris then stated: "That's a lie." The district court did not ask Harris to clarify his comment, and the government concluded its summary by explaining that Harris was "discharged as a program failure due to a cumulative amount of incident reports."

Second, the government presented evidence that Harris possessed a firearm on July 21, 2020. A 911 caller said that a person matching Harris's description was carrying a bag with a firearm inside, and a surveillance video depicted Harris carrying such a bag. Body-camera video from the responding officers showed Harris setting the bag down and fleeing. The government also provided transcripts from the state trial, including testimony from the officer who retrieved the firearm from inside the bag. Harris gave various reasons for why he ran. Initially, he said he had marijuana on him, and later he said he ran because he had an ecstasy pill on him. In closing argument, Harris's state trial attorney told the jury that Harris ran because he had an active arrest warrant. To the state, these shifting explanations were evidence of Harris's guilt. The

government also presented a theory for why Harris must have known the gun was in the bag. He had admitted he knew the bag contained insulin, and he could have known this only by looking inside.

Harris's counsel conceded that Harris possessed the bag but argued that the government failed to prove he knew a firearm was inside it. Harris submitted the transcript of Crawford's state trial testimony. She said she owned the purse and firearm, that on the date of Harris's arrest she had accidentally left her purse at a friend's house, and that the friend had asked Harris to return her purse. She also provided a receipt and gun lockbox to show gun ownership and showed that her insulin was in the purse. Harris argued that Crawford's testimony undercut the government's position that he knew the purse contained a firearm. He emphasized that a state jury had acquitted him of knowingly possessing it. Harris also argued that the 911 caller's identity was unknown and could have been someone trying to set Harris up.

Third, the government presented evidence that on June 4, 2023, Harris attacked another inmate at the MCC and that an unknown assailant stabbed the victim during the resulting melee. Evidence included a video of the incident, reports of witness interviews, and recorded jail calls made by Harris.

### C. Revocation Findings and Sentence

The district court considered the evidence and made its findings. Initially, the court addressed Harris's alleged misconduct at the Salvation Army. Because the reports detailing the misconduct "w[ere] admitted … there's no need for the Court to delve into that in any great detail." The court remarked that Harris's conduct showed "significant drug

problems," "is consistent with his criminal history," and reveals "significant disrespect for the rule of law and an inability to abide by conditions of release."

By a preponderance of the evidence, the court found that Harris knowingly possessed a firearm on July 21, 2020, and thus had unlawfully possessed a firearm while on supervised release. Highlighting the accurate descriptions given by the caller in reporting a firearm in the purse, the court found it "inconceivable" that Harris could not have known the purse's contents. The court also found that the surveillance video showed Harris setting down the bag and abandoning it when he saw the responding police officers. Harris wore the bag in a "crossbody fashion," the court emphasized, seemingly to secure the firearm and two magazines inside it. To the court, there was "no reason that Mr. Harris would … leave [the bag] as he did unless he knew that there was something in it that he shouldn't have in his possession." Moreover, Harris's admission to the arresting officers that he knew the bag contained insulin meant he must have looked inside the bag and seen the gun.

In addition, the district court found that Harris's explanations for fleeing were "inconsistent" and "undermine[d] his credibility." Harris first told the officers that he ran because he was selling drugs, but he had no drugs on him when he was arrested, nor were there drugs in the bag he set down before fleeing. Though Harris claimed he had thrown away his marijuana before the officers detained him, surveillance video undercut that claim. And his assertion that he ran because he possessed an ecstasy pill was likewise undermined because none was found. The court found "curious" Harris's attempt to make a deal with the officers—offering to "get the police

more guns if they [would] let him out the back door" of the
police car. Also considered and rejected was the argument, of-
fered by Harris's counsel at the state trial, that Harris ran be-
cause of an outstanding arrest warrant. As the court put it,
there was no reason for Harris to suspect the police "would
have suddenly shown up at that spot to execute an arrest war-
rant." To the district court, by abandoning the bag and flee-
ing, Harris had purposefully sought to distance himself from
the bag he knew contained a firearm. Separately, the court
called the argument "extraordinarily farfetched" that some-
one may have been trying to "set up" Harris by placing a 911
call to report his firearm possession.

As to the events at the MCC, the district court found that
Harris "was clearly involved in instigating" and engaging in
the fight. "[T]here's no evidence that Mr. Harris was respon-
sible for the stabbing itself," the court noted, but it neverthe-
less found his conduct "serious" and "disturbing."

After pronouncing its findings, the district court turned to
Harris's revocation sentence. His advisory Guidelines range
was calculated as 21 to 27 months' imprisonment for the
supervised release violations. Before the court pronounced
sentence, Harris claimed innocence on the firearm charge—
insisting he "didn't know the weapon was in that purse"—
but "accept[ing] responsibility for using drugs." Harris ex-
plained why he used drugs at the Salvation Army:

> I was kind of weak minded. You know, in situa-
> tions in life I felt like I could have been a little
> more stronger, smoke some marijuana, you
> know, not knowing what they sprayed on it. So
> yeah, I take full responsibility for that, being
> weak minded.

Harris denied his involvement in the incident at the MCC, saying he "never got convicted" of the incident in any disciplinary proceeding, and contending the government was "blam[ing] this big story [on him]."

The court sentenced Harris to concurrent terms of 24 months in prison for failing to participate in the Salvation Army's community corrections program by violating its rules and 36 months in prison for unlawfully possessing a firearm. Finding that Harris had engaged in the prison fight, the court explained it was a factor in his revocation. But the court did not specify a sentence for that conduct because the fight was not formally charged as a violation of his supervised release. No supervised release was ordered upon completion of the 36 months in prison.

In explaining the sentence, the district judge addressed Harris stating, "[y]ou are responsible for what is, in my 11 years on the bench, the most abysmal performance on supervised release of any defendant that's been assigned to my docket." The court emphasized that, "rather than actually accepting responsibility for your conduct, you're still denying your conduct." Overall, the court found that Harris's violations—in conjunction with his "MCC fight," his "abysmal compliance with location monitoring," and "his prior history of supervised release revocation"—compelled an above-Guidelines sentence, with no additional supervision to follow.

After the hearing, a docket entry reflected the revocation of supervised release and the court's sentence. It also noted Harris's motion for the court to calculate when his supervised release should be terminated is "denied for the reasons set forth in the Government's response."

## II

Harris brings two main claims on appeal. First, he contends the district court did not have jurisdiction to rule on the alleged supervised release violations connected to his federal conviction. Second, he submits the district court committed two procedural errors by finding that he "admitted" to the Salvation Army violations and by relying on inaccurate information.

### A.  District Court Jurisdiction

We review de novo whether the district court had jurisdiction to revoke Harris's supervised release. *United States v. Block*, 927 F.3d 978, 981 (7th Cir. 2019). This question cannot be waived. *Id.* A district court may "revoke a term of supervised release, and require the defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release … if the court … finds by a preponderance of the evidence that the defendant violated a condition of supervised release." 18 U.S.C. § 3583(e)(3). Harris argues that the district court lacked jurisdiction to consider his alleged violations at the Salvation Army because his supervised release had expired by the time of the court's decision.[1]

Though a defendant's supervised release ordinarily ends at the conclusion of the term originally imposed by the district court, that term is tolled "during any period in which the person is imprisoned in connection with a conviction for a

---

[1] Harris does not argue that the district court lacked jurisdiction to consider whether he had committed another federal, state, or local crime by possessing a firearm (as charged in the state gun case). Regardless, our reasoning applies to all violations discussed at the revocation hearing.

Federal, State, or local crime … ." 18 U.S.C. § 3624(e). Such imprisonment "pause[s] and postpone[s] an ongoing term" of supervision. *United States v. Maranda*, 761 F.3d 689, 695 (7th Cir. 2014).[2] Harris's three-year term of federal supervised release began on March 17, 2020. But he was imprisoned in the Illinois Department of Corrections for five months of that period when his supervised release was revoked in his state drug case.

Considering the plain language of § 3624(e), numerous federal circuits have held that that statute's tolling provision triggers when a defendant on federal supervised release is imprisoned in a state case. *See, e.g.*, *United States v. Ahmadzai*, 723 F.3d 1089, 1093 (9th Cir. 2013) ("[W]henever a person is imprisoned for one crime, a term of supervised release for another crime does not run, regardless of any other circumstances.") (citation omitted); *United States v. Hernandez-Ferrer*, 599 F.3d 63, 67 (1st Cir. 2010) ("The government is correct that imprisonment lasting for at least thirty days, in connection with a different offense, tolls the running of a supervised release term."); *United States v. House*, 501 F.3d 928, 930 (8th Cir. 2007) ("[U]nder the express terms of 18 U.S.C. § 3624(e), the one-year term of supervised release was tolled … when House began serving an eight-year prison sentence imposed by the State of Missouri."). That remains true even when the

---

[2] Harris also argues *Maranda* supports the argument that his supervised release period was not tolled. But *Maranda* discussed whether the term of a defendant's supervised "release began on the day his prison sentence expired, rather than on the day he was physically released from custody." 761 F.3d at 694. "Rather than analyzing the circumstances that will *toll* an ongoing term of supervised release," the court determined "the circumstance that causes a term of supervised release to *commence*." *Id.* at 698. So, *Maranda* does not support Harris's argument.

state detention results from revocation of a term of state supervision. *See United States v. Bussey*, 745 F.3d 631, 633 (2d Cir. 2014) (finding that defendant's federal supervised release was tolled for the entirety of his 22-month incarceration for violating parole in a New York state case because "the incarceration that results from revocation is a consequence of the underlying crime of conviction"); *United States v. Jackson*, 426 F.3d 301, 303–04 (5th Cir. 2005) (holding that defendant's "[federal] supervised release period was tolled while he was incarcerated for [a state] parole violation," even though the parole violation was later held unconstitutional, because § 3624(e) "indicates that the period of supervised release does not run during imprisonment; the statute states no exceptions").

We agree the plain language of § 3624(e) requires that Harris's term of federal supervised release was tolled during the five months he was incarcerated for violating his state supervised release. So, his supervised release term would expire after the district court made its revocation findings. The district court thus had jurisdiction to rule on Harris's supervised release violations.

Nevertheless, Harris asserts his five-month imprisonment should not count for purposes of § 3624(e)'s tolling provision because it was triggered by the revocation of supervised release and is not a "new 'conviction'". Because incarceration for violations of supervised release is a continuation of an old conviction, Harris says his supervised release term was not tolled. But this analysis is incorrect.

The tolling provision of § 3624(e) is not limited to new convictions or to terms of imprisonment imposed in the immediate wake of sentencing. Rather, by its plain language, a term of federal supervised release "does not run during any period

in which the person is imprisoned in connection with a conviction for a … State … crime." 18 U.S.C. § 3624(e). Here, Harris's five-month imprisonment was in connection with his state drug conviction. His state supervised release was imposed at sentencing for that conviction. And he served the five months of imprisonment at issue as part of that sentence.

Harris relies on *Mont v. United States*, 587 U.S. 514 (2019), to support his argument, but he misreads that case. *Mont* confronted a separate question—whether pretrial detention later credited as time served for the *same* pending conviction is "imprison[ment] in connection with a conviction" and thus tolls the supervised-release term under § 3624(e). *Mont*, 587 U.S. at 516. The Supreme Court held that the pretrial detention was in connection with the pending conviction and tolled supervised release. *Id.*

To reach its holding in *Mont*, the Court analyzed key definitions in the statute, finding, for example, "that 'in connection with' can bear a 'broad interpretation.'" *Id.* at 521. The Court deemed the text of the statute to be retrospective—that is, to compel courts to calculate the time spent "in connection" with a conviction "upon the defendant's release from custody." *Id*. at 523. Additionally, the Court found "it would be an exceedingly odd construction of the statute to give a defendant the windfall of satisfying a new sentence of imprisonment and an old sentence of supervised release with the same period of pretrial detention." *Id.* at 524. This was because "[s]upervised release is a form of punishment that Congress prescribed along with a term of imprisonment as part of the same sentence" and "Congress denies defendants credit for time served if the detention time has already 'been credited against another sentence.'" *Id.* (quoting 18 U.S.C. § 3585(b)).

The Court stressed that defendant's contrary "reading of § 3624(e) would deprive the Government of its lawfully imposed sentence of supervised release while the defendant is serving a separate sentence of incarceration—one often imposed by a different sovereign." *Id.*

*Mont* underscores the plain reading of the tolling statute: when a federal supervisee spends time imprisoned following a state conviction, his term of federal supervised release is tolled for that period. *See id.* at 523–24.

Separately, Harris argues that *United States v. Block*, 927 F.3d 978 (7th Cir. 2019), stands for the proposition that a supervised release period is not tolled during "any time a supervisee spends in detention as part of a revocation of supervised release or when otherwise reincarcerated as a result of an earlier conviction." Again, Harris overreads this precedent. *Block* involved different circumstances than here. If anything, its holding undermines Harris's position.

In *Block*, the probation office reported that the defendant had violated conditions of a three-year term of federal supervised release. The district court detained the defendant pending a hearing on those allegations without issuing any summons or warrant. 927 F.3d at 981. More than a year later, after the defendant's term of supervision had expired, the district court held the hearing and formally revoked his supervised release. *Id.* On appeal, this court held that the district court lacked jurisdiction over the matter because the defendant's period of incarceration pending the revocation hearing did not toll his term of supervision. *Id.* We explained that 18 U.S.C. § 3583(e)(3) grants district courts the power to "'require the defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that

resulted in such term of supervised release.'" *Id.* at 982 (quoting § 3583(e)(3)). In other words, a defendant's pre-hearing detention amounted to an in-custody portion of the three-year term of supervision he was serving—a term that continued to run while he was detained in the *same* federal case. *See id.* As we explained, "§ 3624(e)'s tolling provision is inapposite where a releasee is reincarcerated as a result of his *original conviction*." *Id.* (emphasis added).

This case presents a different situation. Unlike in *Block*, Harris's five months in custody were served on a different case, in a different jurisdiction. To the extent *Block* has any application here, it underscores that Harris's time in custody following the revocation of his state supervised release occurred "as a result" of that state conviction, and thus was in connection with it—precisely as § 3624(e) contemplates. *Block*, 927 F.3d at 982. Indeed, in reaching its holding that a federal supervisee's detention in the same case does not toll his term of supervision, *Block* cited *United States v. Cole*, 567 F.3d 110, 114-15 (3d Cir. 2009): "Congress has provided for tolling in only one situation: where the defendant is imprisoned for more than 30 days for *another* conviction." *Block*, 927 F.3d at 982 (cleaned up). That is the case here.

The rule Harris advocates also would frustrate the purpose of supervised release in the federal system. As the Supreme Court has explained, "'[t]he objectives of supervised release would be unfulfilled if excess prison time were to offset and reduce terms of supervised release' because '[s]upervised release has no statutory function until confinement ends.'" *Mont*, 587 U.S. at 523–24 (citing *United States v. Johnson*, 529 U.S. 53, 59–60 (2000)). The Court also explained that the text of § 3624(e) "reinforces the fact that prison time is 'not

interchangeable' with supervised release." *Id.* at 524 (citing *Johnson*, 529 U.S. at 59). This rationale supports the district court's reading of § 3624(e)'s tolling provision in Harris's case. While Harris was in prison for violating the terms of his state supervised release—purposely excluded from the community—his federal probation officer could not supervise him. "[I]t was impossible for his probation officer to assist him in *returning* to the community." *Jackson*, 426 F.3d at 305.

Altogether, Harris's five-month period of incarceration in Illinois for allegedly violating conditions of his state supervised release tolled the period of his federal supervised release. His federal supervised release term ended more than a month after the revocation hearing. So, the district court had jurisdiction to consider the alleged violations of Harris's supervised release conditions.

## B. Claimed Procedural Errors

Harris also argues that the district court erred at the revocation hearing. If properly preserved, procedural and other constitutional challenges to supervised release revocation proceedings are reviewed de novo. *See United States v. Karst*, 948 F.3d 856, 864 (7th Cir. 2020) (procedural error); *United States v. Lee*, 795 F.3d 682, 685 (7th Cir. 2015) (constitutional arguments). But if a defendant did not raise the issue with the district court—forfeited his claims—his challenge is reviewed for plain error. *Lee*, 795 F.3d at 685. Even more, where a defendant's failure to object was intentional, the challenge is waived. *United States v. Armour*, 804 F.3d 859, 865 (7th Cir. 2015).

Harris claims the district court committed two procedural errors—finding that Harris "admitted" to the Salvation Army violations and relying on inaccurate information.

1. *Admission to Salvation Army Misconduct*

Although "a revocation hearing need not contain all of the procedural protections of" Federal Rule of Criminal Procedure 11 (the rule applicable to guilty pleas), the Federal Rule of Criminal Procedure 32.1 (the rule applicable to revoking or modifying supervised release) does apply. *United States v. Le-Blanc*, 175 F.3d 511, 516 (7th Cir. 1999). So, admissions to violations of supervised release must be knowing and voluntary. *See id.* at 516–17. To determine whether a defendant's waiver of the right to challenge a violation was knowing and voluntary, courts look at the totality of the circumstances. *See id.* at 517. District courts may skip a formal colloquy before accepting an admission—but only if the record confirms that the defendant "'had a sufficient grasp of a particular right or consequence of the waiver.'" *United States v. Nelson*, 931 F.3d 588, 591 (7th Cir. 2019) (quoting *United States v. Boultinghouse*, 784 F.3d 1163, 1172 (7th Cir. 2015)).

The district court found that Harris "admitted" to the Salvation Army violations. So, it saw no need "to delve into that [violation] in any great detail." Harris argues the record does not show any such admission. Though his trial counsel commented about his potential desire to admit the violation, Harris contends he did not admit anything.

At the beginning of the evidentiary hearing, Harris's trial counsel said that Harris was "in a position to admit to" several violations, but counsel did not expressly say that Harris wanted to do so. Later, when the government presented its

evidence, Harris's counsel repeated that he would not challenge any facts alleged in the Salvation Army's reports. But again, counsel did not expressly say that Harris wanted to admit those facts, nor did he say that Harris wanted to admit to a violation. Last, when Harris's lawyer said, "we do not disagree with the report or the things that were alleged regarding the violations at the Salvation Army," Harris interrupted to say, "[t]hat's a lie." The district court did not ask Harris what he meant by this outburst, nor did it ask him directly whether he wanted to challenge the violation.

To Harris, the totality of these circumstances shows that he did not knowingly and voluntarily waive his right to contest this violation. But he does not consider the full record. Harris's counsel relayed—in front of his client—Harris's decision not to contest the allegation that he failed to comply with Salvation Army requirements. His counsel said Harris was "in a position to admit to" several violations, those being "coming up positive for marijuana and … some MDMA" and being "in a restricted or an unauthorized area … at the Salvation Army." Harris did not express disagreement or object. Nor did he speak up later in the hearing when government counsel repeated that Harris was "admitting to the [Salvation Army] violation, which is unlawful use of a controlled substance." Nor did Harris do so when the district court stated the "Salvation Army conduct … was admitted." Even more, near the end of the hearing and before the district court imposed any punishment, Harris addressed the court: "I accepted responsibility for using drugs." Harris explained he "smoke[d] some marijuana … not knowing what they sprayed on it" because he was "weak minded" at the time. He reiterated, "I take full responsibility for that."

This record shows that Harris did not want to contest that he used drugs at the Salvation Army. He thus waived the argument that he did not violate his supervised release conditions with misconduct at the Salvation Army.

2. *Reliance on Accurate Information*

Criminal defendants have "'a due process right to be sentenced on the basis of accurate and reliable information.'" *United States v. Oliver*, 873 F.3d 601, 608–09 (7th Cir. 2017) (quoting *United States v. Corona-Gonzalez*, 628 F.3d 336, 343 (7th Cir. 2010)). This right applies equally to revocation proceedings. *See United States v. White*, 868 F.3d 598, 603–04 (7th Cir. 2017). And a court commits "a significant procedural error if it selects a sentence based on clearly erroneous facts." *Oliver*, 873 F.3d at 609 (cleaned up).

To successfully challenge a sentence on this ground, a defendant "'must show both that information before the sentencing court was inaccurate and that the sentencing court relied on the inaccurate information in the sentencing.'" *Id.* at 609 (citing *Lechner v. Frank*, 341 F.3d 635, 639 (7th Cir. 2003)). The defendant's burden to make this showing is "low." *United States v. Miller*, 900 F.3d 509, 513 (7th Cir. 2018) (quoting *United States v. Barnes*, 907 F.2d 693, 696 (7th Cir. 1990)). And requires "only that 'false information was part of the basis for the sentence.'" *Miller*, 900 F.3d at 513 (quoting *U.S. ex rel. Welch v. Lane*, 738 F.2d 863, 865 (7th Cir. 1984)). The defendant does not have to demonstrate prejudice or "that the judge would have chosen a different sentence if properly informed." *Id.*

Harris claims the district court relied on inaccurate information during the revocation hearing by concluding that he

knowingly possessed a gun. Key to the court's consideration was whether Harris knew the purse he was holding contained a firearm. A jury had found that Harris did not know about the gun when it acquitted him of state gun charges. At the revocation hearing, the government argued the jury got it wrong, in part because of Harris's "changing explanations" for why he ran from the police. The court accepted the government's argument, citing Harris's "inconsistent statements about why he ran" as one of the main reasons for finding that Harris knowingly possessed the gun. In making this finding, the district court discussed three explanations the government cited: that Harris possessed marijuana, that he possessed an ecstasy pill, and that he had a parole violation and knew there was a warrant out for his arrest.

Harris asserts the third statement, about the parole violation and warrant, was made by his counsel, not him. He claims the district court did not pick up on this distinction, which skewed the court's view of his credibility and sentence.

But the district court understood that Harris's counsel made the third statement. After discussing that evidence the court found persuasive, it noted how the three explanations impacted Harris's credibility. The court commented how each was unpersuasive—those Harris offered to the police when he was arrested, and the one his state trial counsel offered. The court identified the explanation that Harris ran because "there was a warrant out for his arrest" as "the defense that was offered at the trial." After rejecting the contention, the court moved to the accounts Harris offered to police—that he possessed marijuana and an ecstasy pill, both of which the surveillance video refuted. Although the court then addressed for a second time "the argument that [Harris] ran because

there was an arrest warrant," the transcript does not support the assertion that the court was unclear about the source of that statement. So, the district court did not rely on inaccurate information.

## III

We compliment the district court for its excellent work in this case. Harris's five-month period of incarceration in Illinois for allegedly violating the supervised release in the state drug case tolled his federal supervised release period. So, the district court had jurisdiction to consider Harris's alleged violations of his federal supervised release conditions. The court did not err in finding that Harris admitted to the Salvation Army violations, and it did not rely on inaccurate information. For these reasons, we AFFIRM the district court.