In the

# United States Court of Appeals
## For the Seventh Circuit

No. 24-2298

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MITCHELL A. MELEGA,

*Defendant-Appellant.*

Appeal from the United States District Court for
the Central District of Illinois.
No. 4:20-cr-40056-JES-JEH-2 — **James E. Shadid**, *Judge.*

ARGUED SEPTEMBER 17, 2025 — DECIDED APRIL 24, 2026

Before SCUDDER, PRYOR, and KOLAR, *Circuit Judges*.

SCUDDER, *Circuit Judge*. Mitchell Melega appeals his 75-month federal sentence for conspiracy, bank fraud, and money laundering based on his role in a multimillion-dollar scheme to defraud two banks. In calculating the advisory sentencing range, the district court applied one two-level enhancement for Melega's use of sophisticated means and another for his role in the offense. The court then sentenced him below the advisory range. Melega challenges both

enhancements, the district court's reliance on certain facts, and its application of the sentencing factors under 18 U.S.C. § 3553(a). We affirm.

**I**

A

Mitchell Melega served as financial controller for I-80 Equipment LLC, a company owned by his co-defendant, Erik Jones, that bought, refurbished, and sold used vehicles. As controller, Melega managed the company's borrowing and participated in management decisions. He held a similar financial role in Jones's property management and rental company, J.P. Rentals LLC.

From about August 2016 to November 2017, Melega and Jones ran a scheme to defraud two regional banks, First Midwest Bank and Northwest Bank, through I-80 and J.P. Rentals. The fraud on each bank followed a similar pattern—Melega and Jones leveraged false promises, and for First Midwest Bank, forged documents, to obtain loan advances for work their companies did not plan to undertake. They then diverted the funds and failed to repay the debt.

The fraud committed through I-80 focused on vehicle loans. Jones executed loan agreements on the company's behalf with First Midwest Bank under which the bank agreed to provide 80% of the capital needed to buy and improve vehicles. I-80 documented purchases with these funds and tracked the vehicles using vehicle identification numbers. The company owed the principal and interest once it sold a vehicle.

But I-80 instead diverted the funds through the following process. Melega would start with a list of vehicles from a supplier. Someone—we do not know who—then altered the

invoices to inflate purchase prices. Melega knowingly submitted the fraudulent invoices, as well as unaltered invoices for vehicles I-80 did not buy, to First Midwest along with a loan-advance request. He also requested funds for improvements to vehicles that I-80 had not purchased. Unbeknownst to the bank, I-80 never intended to buy or improve many of these vehicles. In addition to coordinating the loan applications, Melega directed employees to make excuses for missing vehicles when bank inspectors visited I-80.

Melega and Jones perpetrated a similar scheme to defraud Northwest Bank through Jones's rental company. Jones executed a loan agreement with the bank on behalf of J.P. Rentals to buy and renovate an apartment complex. Northwest Bank later discovered that the improvements associated with certain loan advances were never made. At some point, Jones and Melega discussed diverting funds to pay I-80's debts.

In the end, Melega and Jones's scheme caused over $7,000,000 in losses to First Midwest Bank and Northwest Bank.

A grand jury indicted Melega and Jones with the same 12 counts of bank fraud (18 U.S.C. § 1344), conspiracy to commit bank fraud (18 U.S.C. §§ 1344, 1349), and money laundering (18 U.S.C. § 1957). Jones entered a plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(C) in which he agreed to a sentence between 24 and 60 months' imprisonment. The district court sentenced him to 54 months' imprisonment. Six months after Jones's plea, Melega entered an open plea agreement with no promise of a minimum or maximum sentence.

B

The district court sentenced Melega using the 2023 U.S. Sentencing Guidelines. In doing so, it applied two enhancements over Melega's objections. First, it applied a two-level enhancement for use of sophisticated means under U.S.S.G. § 2B1.1(b)(10)(C). The district court acknowledged that the scheme as a whole was complex, extending beyond garden-variety bank fraud. It further determined that Melega himself undertook sophisticated measures to conceal the fraud by "procur[ing] and produc[ing]" false documents and "hiding" and "redirecting" assets.

Second, the district court applied a two-level role enhancement under U.S.S.G. § 3B1.1(c) after finding that Melega supervised at least one participant in the scheme. Melega admitted that he knowingly gathered falsified documents from I-80 employees and transmitted them to the banks to secure funds. The government offered two examples of Melega going a step further and directing Jones's employees to provide information, including false information, to secure loan advances.

In one email, Melega told I-80 employee Sean Young to obtain a list of vehicles from a supplier, ETI, to use to apply for more bank funds. The email then divulged that the funds would be used in an unauthorized manner—to pay off prior invoices from ETI instead of purchasing new vehicles. This approach would "eliminate any issues with payments in the future" so they could "repeat the cycle going forward." Young ultimately followed through and the funds went to paying off debt to ETI.

In another email, Melega informed J.P. Rentals employee Kim Thompson that the company intended to buy a house

and make renovations, with a total cost of $101,430. Melega directed Thompson to "see what type of improvements [the company could] slip into this estimate to bump that number" up and take advantage of the "remaining proceeds." He also cautioned that the "inflated improvements" should be something "the appraiser can't put his eyes on from the road." From there the company would try to have a tenant in the property before the appraiser could reevaluate, making it "more difficult for him to assess internal renovations." The record does not tell us if Thompson complied.

After hearing about both emails, the district court determined that Melega "supervised or controlled somebody … specifically one participant." It did not name who, but it did adopt the government's position on the facts and those recounted in the Probation Office's Presentence Investigation Report.

Once it addressed all of Melega's objections to the PSR, the district court adopted its calculation of a sentencing range of 97 to 121 months' imprisonment based on a total offense level of 30 points and criminal history category of I.

The district court then heard Melega's mitigation evidence and sentenced him below the advisory range to 75 months' imprisonment. The court observed that 75 months was the median sentence for the offense level. It also addressed the 21-month disparity between Melega and Jones's sentences explaining that, while the culpability for each defendant was similar, Melega did not take full responsibility for his actions. The fraud scheme was also "arguably" Melega's "second go-around" because the PSR indicated that he stole from a prior employer. This conduct, the court observed, demonstrated

that the sentence needed to protect the public from further crime.

Melega now appeals, challenging the district court's application of the sentencing enhancements, reliance on certain facts, and the disparity with Jones's sentence.

## II

### A

We review the district court's findings of fact for clear error and whether those facts support an enhancement without deference. See *United States v. Dennis*, 119 F.4th 1103, 1109 (7th Cir. 2024). A sentencing court must find by a preponderance that the facts support the enhancement in question. See *id.* We may also affirm an enhancement on any ground supported by the record. See *United States v. Sheikh*, 367 F.3d 683, 688 (7th Cir. 2004). Where, as here, the district court adopted the Probation Office's findings of fact for sentencing, the record available for review includes the PSR. See *United States v. Strache*, 202 F.3d 980, 987 (7th Cir. 2000).

The Sentencing Commission authorized a two-level enhancement if the offense "involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." U.S.S.G. § 2B1.1(b)(10)(C). "Sophisticated means" entail "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." *Id.* § 2B1.1 cmt. n.9(B). The enhancement "does not require a brilliant scheme, just one that displays a greater level of planning or concealment than the usual fraud case." *United States v. Kowalski*, 103 F.4th 1273, 1278 (7th Cir. 2024) (quoting *United States v. Lundberg*, 990 F.3d 1087, 1097 (7th Cir. 2021)).

The district court committed no error in imposing the enhancement. In no uncertain terms, the court found that the overall scheme was "relatively intricate." The record supports that finding, as the fraud extended over a year and required Jones's companies to track and hide assets to perpetuate it without detection. The court also underscored the sophistication of Melega's actions, identifying his role in "procur[ing]" false documents and "produc[ing]" them to the banks, as well as "redirecting or hiding" the assets "knowing they were fraudulent." See *United States v. Griffin*, 76 F.4th 724, 751 (7th Cir. 2023) (observing that a district court cannot apply § 2B1.1(b)(10)(C) without determining "whether the defendant's own conduct was 'sophisticated'" (quoting U.S.S.G. Supp. App. C, Amdt. 792 (Reason for Amendment))). While the court could have elaborated more on Melega's specific acts, the record is sufficient to support the finding that he used sophisticated means to carry out the fraud.

To be sure, we recognize that merely transmitting fraudulent documents to a bank is no more complex than the average fraud scheme, as virtually all bank fraud involves fabrications or misrepresentations. See *United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014). At the same time, concealment need not go "far beyond" the "concealment inherent in the fraud" to be sophisticated. *Griffin*, 76 F.4th at 751 (cleaned up).

Melega went much further. As I-80's controller, he stood at the epicenter of the scheme, not only handling the procurement and submission of fraudulent loan requests but also participating in financial decisions about when and how to request and divert funds. See *United States v. Knox*, 624 F.3d 865, 871 (7th Cir. 2010) ("Knox's coordination of various moving parts of the scheme and his ability to fool so many lenders …

also speaks to the scheme's sophistication."). For instance, Melega and Jones discussed drawing funds from the Northwest Bank loan to pay I-80's expenses. Melega also told Thompson how to covertly pad a loan request. And he directed Young to obtain information for more loan advancements, revealing that I-80 would divert the funds to avoid financial calamity and repeat. This is textbook sophisticated planning and coordination.

Melega disclaims authoring the email to Young because it did not bear his written signature even though it came from his account. But the district court seemed to resolve this dispute by hearing each side on the issue and then accepting the government's position that Melega sent it. It also accepted the PSR, which echoes that position. See *United States v. Blake*, 965 F.3d 554, 559 (7th Cir. 2020) (holding that a sentencing court may resolve a factual dispute consistent with Federal Rule of Criminal Procedure 32(i)(3) by adopting the government's position, as set forth in the PSR, without further explanation).

That ruling was not clearly erroneous. Melega never explained how the email could have been sent from his address without his knowledge or permission. And the thrust of it mirrors his unchallenged email to Thompson in which he admitted similar fraudulent intent. See *United States v. Sunmola*, 887 F.3d 830, 837 (7th Cir. 2018) (observing that a sentencing court has broad discretion to make factual determinations and may draw conclusions from evidence that has sufficient indicia of reliability).

Beyond coordinating the fraud, Melega hid his deception by directing I-80 employees to make excuses about why vehicles were missing when banks showed up to conduct inspections. Melega may not have lied to bank inspectors himself,

but he caused others to do so. See U.S.S.G. § 2B1.1(b)(10)(C) (providing that the enhancement applies if "the defendant intentionally engaged in or *caused* the conduct constituting sophisticated means" (emphasis added)).

In the final analysis, Melega's actions evinced a "greater level of planning or concealment" than the typical bank fraud. *United States v. Harris*, 791 F.3d 772, 781 (7th Cir. 2015). His deception allowed the scheme to continue for over a year. See *United States v. Friedman*, 971 F.3d 700, 716–17 (7th Cir. 2020) (determining that "covering … up" a bank fraud scheme "over a span of three years, as opposed to one or two fake loan applications" contributed to the scheme's sophistication for the purposes of a § 2B1.1(b)(10)(C) enhancement). The district court did not clearly err in applying the enhancement.

B

Melega next challenges his role enhancement under U.S.S.G. § 3B1.1, which increases the offense level for a defendant who acts as an organizer, leader, manager, or supervisor in a criminal scheme, reflecting their "greater contributions to" and "culpability in" the offense. *United States v. Colon*, 919 F.3d 510, 517–18 (7th Cir. 2019). The defendant must have acted in one of these roles vis-a-vis "one or more other participants," which is "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 cmt. nn.1–2. If the scheme had fewer than five participants and was not otherwise extensive, the offense level increases by two points. *Id.* § 3B1.1(c).

The Guidelines do not define "organizer," "leader," "manager," or "supervisor," but they provide factors to consider such as:

> The exercise of decision making authority, the
> nature of participation in the commission of the
> offense, the recruitment of accomplices, the
> claimed right to a larger share of the fruits of the
> crime, the degree of participation in planning or
> organizing the offense, the nature and scope of
> the illegal activity, and the degree of control and
> authority exercised over others.

*Id.* § 3B1.1 cmt. n.4. No one factor is necessary. For instance, it can be enough that a defendant "orchestrat[ed] or coordinat[ed] activities performed by others" without giving direct orders. *United States v. Barnes*, 141 F.4th 882, 888 (7th Cir. 2025) (cleaned up). We have emphasized that "commonsense judgment[s] about the defendant's relative culpability" should drive the application of a § 3B1.1 enhancement. *Id.* (cleaned up).

The district court did not err in applying the two-level enhancement to Melega. After hearing about his emails to Sean Young and Kim Thomspon, the court found that he had supervised a participant. It did not specify who, but since the district court stood on firm ground in finding that Melega sent the email to Young, it is easy to conclude that Melega supervised or managed him. And Young was a participant because he knowingly assisted the fraud. See *United States v. Cooper*, 767 F.3d 721, 733–34 (7th Cir. 2014) ("[T]he district court is not required to explicitly name the participant the defendant controlled so long as it is clear from its findings and the evidence that the defendant actually did manage or supervise a participant."). This suffices for a § 3B1.1(c) role enhancement.

But there is more. Factors that supported the § 2B1.1(b)(10)(C) enhancement also apply and merit brief

mention. See *United States v. Robinson*, 538 F.3d 605, 608 (7th Cir. 2008) ("[E]ven if there is significant overlap, the same facts can serve as a foundation for both [sophisticated means and role enhancements].").

Melega actively planned, coordinated, and concealed the fraud. He was more than a conduit or middleman. Cf. *Colon*, 919 F.3d at 518 ("[M]iddleman status alone cannot support a [§ 3B1.1 enhancement]." (cleaned up)). Melega's directive to Young is one illustration. See *id.* at 519 ("[F]or any leadership enhancement to apply, the district court must identify instances where the defendant orchestrated or oversaw [a participant]."). He also directed I-80 employees to lie to bank inspectors to conceal the loan diversion. Overall, the record shows that Melega exercised enough influence over other participants to warrant a two-level enhancement under § 3B1.1(c) as a manager or supervisor.

## C

Finally, Melega contends that his sentence was procedurally unreasonable because the district court based it on unreliable facts and failed to avoid an unwarranted disparity with his co-defendant's sentence. Neither position holds up.

A court "procedurally errs when it relies on unreliable or inaccurate information in making its sentencing decision." *United States v. Campbell*, 99 F.4th 957, 960 (7th Cir. 2024) (cleaned up). Melega highlights three points that the district court should not have relied on: that he was more culpable than Jones, that he was the "brains of [the] operation," and that he had stolen from a prior employer.

The district court never made the first two of these conclusions, however. After hearing from both parties, the court

determined that Melega and Jones's roles were on par and that their level of culpability was "very similar."

Melega likely waived his right to challenge the last point—that he stole from a prior employer—by not doing so before or during sentencing. See *United States v. Propst*, 959 F.3d 298, 302–03 (7th Cir. 2020). Regardless, he has not shown that the information is inaccurate. See *United States v. Harris*, 118 F.4th 875, 887 (7th Cir. 2024). The PSR explained that Melega was a finance specialist for Full Circle Services, Inc. before joining I-80. Full Circle informed the Probation Office that it fired Melega after he used a company credit card for personal use and attributed over 100 employees' state and federal tax withholdings towards his own. Melega observes that this information contains hearsay. Perhaps, but hearsay alone does not render the evidence unreliable. See *United States v. Mitchell*, 635 F.3d 990, 993–94 (7th Cir. 2011) ("[A] district court may consider hearsay at sentencing unless it is devoid of any indicia of reliability." (cleaned up)).

Next, Melega lodges a procedural challenge to the 21-month gap between his and Jones's sentences. "[18 U.S.C.] § 3553(a)(6) requires district courts to consider the need to avoid unwarranted sentencing disparities …." *United States v. Brooks*, 100 F.4th 825, 840 (7th Cir. 2024). That includes a disparity with similar sentences imposed nationwide and with a co-defendant. See *United States v. Moore*, 50 F.4th 597, 604 (7th Cir. 2022).

But the district court explained why it sentenced Jones and Melega differently. While they pleaded guilty to the same charges and exhibited similar culpability, Melega had stolen before and did not accept responsibility as fully as Jones. Those differences created a greater need for deterrence.

Although not framed this way, Melega's challenge is also substantive because he contests the weight the district court gave to his prior conduct and acceptance of responsibility. See *United States v. Jerry*, 55 F.4th 1124, 1132 (7th Cir. 2022) ("[W]hen evaluating the procedural soundness of a sentence, we do not explore its reasonableness; that inquiry is reserved for a substantive challenge." (cleaned up)). Melega faces an uphill battle because a sentence below the Guidelines is presumptively reasonable. See *United States v. Seymour*, 94 F.4th 679, 687 (7th Cir. 2024); *id.* at 687–88 ("[W]e have never held that a below-Guidelines sentence is unreasonably high."). He cannot rebut that presumption.

First, Melega's theft from his prior employer is relevant to his sentence even though it did not result in a criminal conviction because the misconduct is similar. See *United States v. Laraneta*, 700 F.3d 983, 987 (7th Cir. 2012) ("[C]onduct relevant to the crime of conviction can be considered in calculating a sentence even if that conduct did not result in a conviction."). Jones, by contrast, did not have any criminal history.

Second, Melega took less accountability than Jones. Unlike Jones, Melega downplayed his role and misconduct in a letter to the district court. He cast himself as "ignorant and passive to the things going on around [him]," in stark contrast to the record evidence. Again, this difference is relevant to the need for deterrence and may pertain to other § 3353(a) factors such as the need to promote respect for the rule of law. See, *e.g.*, *United States v. Travis*, 294 F.3d 837, 840 (7th Cir. 2002) (explaining that acceptance of responsibility considers the "reduced rate of recidivism among defendants who admit the wrongfulness of their actions").

It does seem true that Melega and Jones received the same two-level decrease for acceptance of responsibility under U.S.S.G. § 3E1.1(a) as a matter of calculating their sentencing ranges. But a district court may consider the same conduct in calculating the guidelines range and in its § 3553(a) analysis. See *United States v. Gonzalez*, 3 F.4th 963, 967 (7th Cir. 2021) ("Even if the Guidelines and § 3553(a) sometimes overlap, we have never held that a judge must … articulate why specific Guidelines factors inadequately account for the nature of the crime … or any other statutory factor." (quoting *United States v. Kuczora*, 910 F.3d 904, 908 (7th Cir. 2018))). And that may lead to a reasonable and warranted sentencing disparity between co-defendants when their accountability differs, even if they both have done enough to receive acceptance-of-responsibility credit under § 3E1.1(a).

The district court could not, as Melega suggests, have given Jones a greater offense-level reduction under § 3E1.1 because he took more accountability than Melega. The Guidelines provide a base deduction of two points for acceptance of responsibility. See U.S.S.G. § 3E1.1(a). A defendant may only receive a three-point reduction under § 3E1.1(b) if the government files a motion stating that the defendant has timely assisted authorities to warrant the reduction. See *id.* § 3E1.1(b) & cmt. n.6. Here, it did not. So the district court could only account for the difference in Melega's and Jones's relative accountability by considering it in its § 3553(a) analysis. And we are not aware of case law preventing a district court from calibrating a defendant's sentence in this way.

In the end, the district court did not abuse its discretion in sentencing Melega to 21 months more than Erik Jones.

For these reasons, we AFFIRM.